## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,[1]

       Plaintiff,

vs.                                                                    No. CIV 07-0829 JB/LCS

CONLEY'S NURSERY AND
LANDSCAPING, INC., and TED CONLEY,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment, filed November 24, 2008 (Doc. 26).  The Court held a hearing on January 7, 2009.  The

primary issue is whether the undisputed facts show that the Defendants need not pay their employees

overtime because the employees are exempt from the overtime provision of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 207(a)(1), on the grounds that they are agricultural workers.  A

secondary issue is whether the FLSA statute of limitations has run on any claim accruing before

August 24, 2005.  Because the Court concludes that there are genuine issues of material fact

regarding the operations at Defendant Conley's Nursery and Landscaping, Inc. that prevent the

Court from holding the exemption applicable to the employees as a matter of law, the Court will

deny the motion for summary judgment with respect to the exemption.  Because the Plaintiff

concedes that the statute of limitations has run on claims before August 24, 2005, the Court will

grant summary judgment on that issue.

---

[1] Hilda L. Solis is substituted as Plaintiff under rule 25(d) of the Federal Rules of Civil Procedure.  On February 24, 2009, the United States Senate confirmed Solis' nomination as Secretary of Labor.

## FACTUAL BACKGROUND

This case arises out of a dispute between the United States Department of Labor and the Defendants about the status of employees at Conley's.  Employers are not required to pay agricultural employees for overtime.  The Defendants run a nursery and landscaping business.  Defendant Ted Conley is the President and owner of Conley's.  Contending that their employees qualify as agricultural employees, the Defendants believe that they need not pay overtime to the employees.  The Plaintiff disagrees.

According to the Defendants, the primary activity of Conley's is "to grow plants, flowers, shrubs, and trees from seedlings, cuttings or by transplanting."  Declaration of Ted Conley Under Penalty of Perjury in Support of Defendants' Motion for Summary Judgment ¶ 3, at 1 (executed November 19, 2008)(Doc. 26-3)("Conley Decl.").  Some plants are grown by planting flowers, shrubs, and trees grown at the nursery.  See id. ¶ 4, at 1.  Upon a customer's request, Conley's will order plants from other nurseries.  See id. ¶ 6, at 2.  In Ted Conley's estimation, these special requests, by either dollar amount, volume, or number of plants compared with plants grown at the nursery, account for less than one percent of Conley's sales.  See id.  Conley's will also order plants from other nurseries and then grow them to a larger size in its nursery before selling the plants.  See id. ¶ 7, at 2.

According to the Defendants, employees of Conley's cultivate almost all the plants it sells.  See id. ¶ 9, at 2.  These employees will grow plants to a larger size by watering, fertilizing, and weeding them, and also repotting them in larger containers when needed.  See id.  Conley's has a single location in Ruidoso, New Mexico on a six-acre tract with a nursery building, sales office, greenhouses and three-and-a-half acres for crop production.  See id. ¶ 8, at 2.  All the plants that Conley's sells are grown at this site.  See id.

-2-

Another segment of Conley's business is landscaping. According to Ted Conley, those "employees working in the landscaping portion of the business are not separately organized as an independent productive activity." Id. ¶ 10, at 2. The landscaping operation "does not construct pools, walks or drive ways." Id. ¶ 11, at 2. Instead, customers pick out plants grown at Conley's, and "arrange for the installation of watering systems, plants and often mulching systems." Id. ¶ 5, at 2.

The Plaintiff disputes that Conley's primary activity is growing plants, that the number of plants ordered from other nurseries is minimal, and that Conley's will generally grow plants to a larger size by watering, weeding, and otherwise tending plants. In support of her contentions, the Plaintiff relies on the affidavit of Jerry Deal, a former landscaping foreman at Conley's. See Declaration of Jerry Deal ¶ 3, at 1 (executed December 8, 2008)(Doc. 30-3)("Deal Decl."). Deal estimates "that 90-95% of flowers and over 98% of the trees and shrubs used for landscaping purposes were purchased from outside vendors." Id. ¶ 5, at 1. According to Deal, Conley's would grow "plants like tomatoes, chili peppers, and perennial flowers," but "[t]he trees, shrubs, and annuals at the nursery, and those used for landscaping purposes were purchased from outside vendors." Id. ¶ 6, at 1.

As further support for her contentions, the Plaintiff also cites the deposition of Aaron Aragon, an inspector who interviewed Ted Conley during a hearing that was apparently part of an Albuquerque Wage and Hour Division investigation into the Defendants' employment practices.[2] In his deposition, Aragon relates that Ted Conley, during a wage-and-hour hearing, stated that "he grew perennials and he bought seeds, which he started in trays for items such as tomatoes and

---

[2] The Response refers to the Albuquerque Wage and Hour Division. See Response at 1. It is unclear why, if Conley's is primarily based in Ruidoso, this agency was involved.

perennials, but that annuals were also brought in" and, apparently quoting from a transcript of that hearing, Ted Conley said "[t]rees and shrubs were also brought in."  Deposition of Aaron Aragon at 26:10-13 (taken October 17, 2008)(Doc. 30-2)("Aragon Depo.").  At another point in the wage-and-hour hearing, Aragon asked Ted Conley whether he grew "anything else other than [tomatoes and perennials], such as things that were in the greenhouse, the things that were out back.  And [Ted Conley] said all of those were brought in."  Id. at 10:24-11:2.  When Aragon followed up, Ted Conley said "things like trees and shrubs are brought in from other states."  Id. at 11:3-4.  The Plaintiff also contends that Ted Conley has an overly expansive view of what it means to grow a plant, asserting that Ted Conley said that, when he got a plant from an outside vendor. "'the first time I put water on that plant I'm growing it.'"  Response at 7 (quoting Deposition of Ted Conley at 80:5).[3]

## PROCEDURAL BACKGROUND

On August 24, 2007, the Plaintiff filed a Complaint against the Defendants.  The Complaint alleges that, since March 14, 2004, the Defendants have been employing workers longer than forty hours a week without paying them at least time-and-a-half for overtime.  See Complaint ¶ VI, at 3, filed August 24, 2007 (Doc. 1).  The Plaintiff seeks injunctive relief as well as compensation and liquidated damages for the unpaid overtime.  See id. ¶ VII, at 3-4.

The Defendants now move the Court to grant them summary judgment and dismiss the case in its entirety.  They argue that the FLSA's exemption from overtime-pay requirements for agricultural employees applies to their workers.  Based upon Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755 (1949), they contend that the exemption covers both primary and secondary

---

[3] Although quoted in the Response, no copy of the deposition was attached to the Response or to the other documents submitted to the Court.

activities.  See Motion at 5.  They assert that courts have given an expansive reading to the definition

of agricultural activity that would cover their company and that nurseries fall within that definition.

See id. at 6.  Attempting to predict the Plaintiff's rebuttals, they maintain that they would not lose

an exemption by virtue of buying some plants from other nurseries because such purchases are

minor and would fall under the de minimis doctrine.  See id. at 6-9.  The Defendants also contend

that, while there are no cases directly on point from the United States Court of Appeals for the Tenth

Circuit, Tenth Circuit case law supports the exemption applying to Conley's employees.  See id. at

9-12.  Finally, the Defendants argue that there is no evidence of any willful violation in this case and

thus the two-year statute of limitations should bar any claim before August 24, 2005.  See id. at 12-

13.

       In response, the Plaintiff contends that determining whether an exemption to the FLSA

applies is a fact-bound inquiry and that resolution of the necessary factual issues in inappropriate

on the Defendants' motion.  See Plaintiff's Response to Defendants Motion for Summary Judgment

at 3-4, filed December 10, 2008 (Doc. 30)("Response").  The Plaintiff further contends that the

Defendants have failed to present the Court with the details of their employees' day-to-day duties

that are necessary to decide whether the exemption applies.  See id. at 4.  Next, the Plaintiff contends

that there are a number of disputes about the Defendants' purportedly undisputed facts.  In

particular, the Plaintiff asserts that Ted Conley's statements to an investigator and a former

employee's statements show that much of Conley's business involves buying and reselling plants

from others, making them a wholesaler not entitled to an exemption.  See id. at 5-7.  The Plaintiff

also challenges Ted Conley's interpretation of what counts as growing a plant.  The Plaintiff

contends that Ted Conley's view -- allegedly that watering a plant is enough -- expands the

exemption's scope beyond reasonable limits and that Ted Conley is apparently including stock

received from outside vendors as part of the stock grown at Conley's when estimating the percentage of plants grown at the nursery.  See id. at 7.  Lastly, the Plaintiff states that the Complaint does not allege willful behavior and that the statute of limitations would bar the Plaintiff from seeking back wages from before August 24, 2005, but that the Plaintiff is seeking wages accrued only since that date.

In reply, the Defendants contend that the Plaintiff failed to contest a number of the factual paragraphs in her motion and that the Court should find those facts to be admitted.  See Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 1-4, filed December 25, 2008 (Doc. 32).  The Defendants next argue that the affidavit of their former employee does not create a factual dispute and that, in particular, purchasing plants from third-parties does not prevent the Defendants from then growing those plants at their nursery.  See id. at 4-5.  The Defendants further argue that Department of Labor regulations include watering as part of agricultural activities for a nursery, and that the Plaintiff mischaracterizes Ted Conley's statements because watering is only part of what the Defendants consider involved in the growing process.  See id. at 6.  Drawing upon Tenth Circuit case law regarding business owners testifying about their companies' lost profits and similar matters, the Defendants also maintain that Ted Conley's estimates about Conley's business are reliable and admissible evidence that the Court can consider.  See id. at 7-10.

At the hearing, Steven Sanders, the Defendants' attorney, initially admitted that the Court could determine the extent of Conley's employees' involvement with plants from other nurseries only by discounting Deal's declaration.  See Transcript of Hearing at 3:23-4:6 (Court & Sanders)(taken January 7, 2009)("Tr.").[4]  Mr. Sanders contended that the declaration could be

_____

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain different page and/or line numbers.

-6-

discounted because it was conclusory and did not address directly whether the plants to which the declaration referred were grown after being purchased from other nurseries.  See id. at 4:10-5:14. He then stressed, however, that the declaration was not inconsistent with Ted Conley's declaration anyway, because Deal could be correct about the volume of plants bought from other nurseries -- and Ted Conley admits to buying from other nurseries -- without undercutting Ted Conley's statements that the Defendants continued to grow those plants obtained from outside vendors. See id. at 7:16-9:21.  Carlton Jackson, the Plaintiff's counsel, stated that he believed the Defendants had failed to produce evidence about what employees would do to the plants from other nurseries and how long they were kept.  See id. at 18:21-19:18 (Court & Jackson).  Mr. Sanders agreed that there was nothing in the record to indicate how long Conley's kept plants before selling them and that, if plants were sold the day after acquisition, the exemption would probably not apply, but that Tom Conley's declaration stated that plants were grown to a larger size.  See id. at 20:7-22:1 (Court & Sanders).

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if "under the applicable substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d at 670 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).

The party moving for summary judgment has the initial burden of showing the absence of

any genuine issue of material fact and entitlement to judgment as a matter of law.  See Adler v. Wal-Mart  Stores, Inc., 144 F.3d at 670-71.  The moving party can meet this burden by "showing – that is, by pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If this burden is met, the burden shifts to the other party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  The opposing party may not rest on its pleadings, but must "set forth specifics facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Adler v. Wal-Mart Stores, Inc., 144 F.3d at 671 (internal quotation marks omitted).  When deciding whether to grant summary judgment, a court "must draw all reasonable inferences in favor of the non-moving party." Tademy v. Union Pacific Corp., 520 F.3d 1149, 1158 (10th Cir. 2008).

## RELEVANT FLSA LAW

Enacted in 1938, the FLSA regulates a number of aspects of the employer-employee relationship.  Among the FLSA's provisions is a general requirement that employers pay overtime. Employers may not employ workers for a "workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  Like many broad rules in the law, this general proposition has numerous exceptions.  Relevant here is an exemption for agricultural employees.

### 1.    Agricultural Exemption.

Exemptions to the FLSA are "narrowly construe[d]." Pacheco v. Whiting Farms, Inc., 365 F.3d 1199, 1203 (10th Cir. 2004).  "An employer bears the burden of showing its practices plainly and unmistakably fall within the exemption." Id.  Under § 213(b)(12), certain employees "employed

in agriculture" are exempt from the overtime provisions.  Agriculture is defined as including

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f).  A number of court decisions have examined the scope of the agricultural exemption.

The Supreme Court of the United States explained in Farmers Reservoir & Irrigation Co. v. McComb that the statutory definition of agriculture embraces two related concepts: (i) primary agriculture; and (ii) secondary agriculture.  See 337 U.S. at 762-63.

> First, there is the primary meaning.  Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning.  Second, there is the broader meaning.  Agriculture is defined to include things other than farming as so illustrated.  It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with "such" farming operations.

Id.  Although exemptions are narrowly construed, "[t]he agricultural exemption was meant to apply broadly and to embrace the whole field of agriculture."  Pacheco v. Whiting Farms, Inc., 365 F.3d at 1203 (internal quotation marks omitted).

As a result of the bifurcated definition of agriculture, activities that are not themselves agricultural may nonetheless qualify for the exemption.  See id. at 1204.  For example, the packaging of chicken pelts for shipment is incidental to the agricultural activity of raising chickens for skinning and thus exempt.  See id.  The United States Court of Appeals for the Seventh Circuit has held that work connected with the sale of flower pots by a nursery is exempt.  See Adkins v.

Mid-American Growers, Inc., 167 F.3d 355, 357 (7th Cir. 1999).  Ultimately, "the question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity."  Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. at 761.

### 2.    Nurseries and the Agricultural Exemption.

Courts have applied the agricultural exemption to nurseries.  See, e.g., Adkins v. Mid-American Growers, Inc., 167 F.3d at 356-58 (discussing scope of exemption with respect to various activities at large commercial nursery); Wirtz v. Jackson & Perkins Co., 312 F.2d 48, 50-51 (2d Cir. 1963).  The Department of Labor has also promulgated regulations that state that nursery employees performing particular tasks are engaged in agricultural work:

> The employees of a nursery who are engaged in the following activities are employed in agriculture:
>
> (1) Sowing seeds and otherwise propagating fruit, nut, shade, vegetable, and ornamental plants or trees, and shrubs, vines, and flowers;
>
> (2) Handling such plants from propagating frames to the field;
>
> (3) Planting, cultivating, watering, spraying, fertilizing, pruning, bracing, and feeding the growing crop.

29 C.F.R. § 780.205(a).  West's Employment Coordinator (2009) takes a similar view:

> The planting of trees and bushes is within the scope of agriculture where it is either a step in the production, cultivation, growing, and harvesting of agricultural or horticultural commodities, or a practice performed by a farmer or on a farm as an incident to, or in conjunction with, farming operations.
>
> The agricultural exemption extends to:
> . . . employees of a nurseryman who raised the nursery stock, when they plant the stock on private or public property, trim, spray, brace, and treat the planted stock, or perform other duties incidental to its care and preservation.
> . . . employees who plant fruit trees and berry stock not raised by their employer where the planting is done on a farm as an incident to, or in conjunction with, the farming operation in that farm;

-10-

. . . nursery employees who obtain plants growing wild in the woods or in fields on
a farm, which are to be further cultivated by the nursery before they are sold by it;
. . . employees engaged in transplanting wild plants in the nursery.

3 Emp. Coord. Compensation § 4:38.

In Adkins v. Mid-American Growers, Inc., the Seventh Circuit faced a situation involving

a number of facts and issues similar to the ones presented in this case.   The Seventh Circuit

discussed a number of issues relevant here:

The core of Mid-American's operation is a 1 million square foot greenhouse in
which the company grows and sells more than a million plants every year. . . . [T]he
district judge found that nearly 98 percent of Mid-American's sales, consisting of
plants grown "from scratch" (that is, from seeds, bulbs, cuttings, or starter plants),
are uncontroversially within the exemption. The controversy centers on the other 2
percent of Mid-American's sales, which are of mature plants purchased from other
growers. Most of these are foliage plants that Mid-American purchases from growers
in the South, mainly Florida. Because Mid-American's sales area has a colder
climate than the areas from which these plants come, the plants' prospects for
flourishing in their new environment are enhanced if they undergo a process called
"acclimatization." The process involves subjecting the plants in Mid-American's
greenhouse, prior to sale, to reduced levels of light, temperature, humidity, and
fertilizer in order to foster a smooth transition to the harsher environment in which
the plants are to live after they are sold. The process takes two to six weeks but some
of the plants are sold sooner -- some almost immediately -- either because they look
particularly robust or because customers want them regardless. The acclimatization
process clearly is agricultural; it is a form of "cultivating . . . the growing crop."

In addition to the southern foliage plants, Mid-American buys some mature plants
from other growers in order to cover its obligations, either contractual or customary,
to its customers in the event that its own production is inadequate because of blight
or other disasters. Sometimes, however, Mid-American has an excess of customer
orders over available production not because of a production shortfall but because
it has accepted more orders than even its normal production capacity can fill, and
then it buys the plants it needs in order to fill these orders from other growers and
resells the plants without doing any agricultural work on them.

When Mid-American buys plants and then resells them without doing significant
agricultural work it is operating as a wholesaler rather than as a grower, and
wholesalers of agricultural commodities are not exempt from the Act. But the
agricultural exemption does cover nonagricultural activities that are incidental to the
core activities that the statute exempts. . . . The cases call such activities "secondary
agriculture." There are two uncontroversial examples in the present case. Work

-11-

connected with the sale of flower pots (also planters and other containers) is exempt even when the pots are sold without any plants or flowers in them. And work connected with those cover purchases that Mid-American makes because of production shortfalls, though not those it makes merely because of an excess of orders over normal production, is also exempt.

That leaves the southern foliage plants that are sold without being acclimatized and the cover purchases not warranted by production shortfalls. These two categories of nonexempt "wholesaling" account for some unknown but presumably small percentage of the 2 percent of Mid-American's sales that is not conceded to be exempt.

Adkins v. Mid-American Growers, Inc., 167 F.3d at 356-57 (citations omitted).

### 3.    The De Minimis Doctrine.

Adkins v. Mid-American Growers, Inc. also illustrates the working of the de minimis

doctrine.  As the Seventh Circuit explained:

The underlying reason why the agricultural exemption includes some nonagricultural activity is that it is not always feasible to separate agricultural from nonagricultural labor. The problem is illustrated by flowers that are sold in pots. If a worker works on such a product more than 40 hours a week, is the overtime agricultural or nonagricultural? It is both, but since the nonagricultural component is minor and inseparable, and since the FLSA does not permit overtime pay to be prorated for a worker who does both exempt and nonexempt work, the employer is given a break and the work classified as entirely agricultural. To deny him the break would burden the efficient integration of closely related activities, especially in situations in which the amount of nonexempt activity is too slight to warrant the expense of a separate work force.  But where the nonexempt activity can be feasibly separated from the exempt, the separation is essential to prevent agricultural enterprises from obtaining an artificial competitive advantage over enterprises that do not enjoy an exemption from the Fair Labor Standards Act.

Adkins v. Mid-American Growers, Inc., 167 F.3d at 358 (citations omitted).

In Walling v. Rocklin, 132 F.2d 3 (8th Cir. 1942), the United States Court of Appeals for the

Eighth Circuit held that a flower business that had five to ten percent of its total sales coming from

product that was bought from others to cover shortfalls was entitled to the agricultural exemption.

As the Eight Circuit put it:

> [T]he occasional purchase and sale of products necessitated by reason of storms, frost, and other emergencies, caused by the natural elements as shown by the record is, we think, quite consistent with the theory that defendants are primarily and exclusively engaged in agriculture in the production of flowers, plants, flowering shrubs, ornamental grasses, etc., necessary to meet the wants of purchasers of flowers and floral designs and tributes.

Id. at 7 (internal quotation marks omitted).  Accord Wirtz v. Jackson & Perkins Co., 312 F.2d at 51 (holding that nursery's occasional purchase of outside stock to make up for shortages from nursery's crop failures was in conjunction with nursery's farming operation and thus within agricultural exemption).  In Damutz v. William Pinchbeck, Inc., 158 F.2d 882 (2d Cir. 1947)(per curiam), the United States Court of Appeals for the Second Circuit held that, under the de minimis doctrine, an employer did not lose its exemption when "a small part of the defendant's business, less than one-half of one per cent, had been the marketing on a commission basis of cut flowers obtained from another grower."  Id. at 883.

### 4.    Statute of Limitations.

Actions brought to enforce the FLSA's overtime provisions are generally subject to a two-year statute of limitations unless the violation is willful, in which case the limitations period is three years.  With respect to a lawsuit "to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages," 29 U.S. § 255, the suit --

> if the cause of action accrues on or after May 14, 1947 -- may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

29 U.S.C. § 255(a).  Willful violations occur when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)(citing Trans World Airlines, Inc. v. Thurston, 469

-13-

U.S. 111 (1985)).

## ANALYSIS

Much of the basic legal and factual framework regarding whether Conley's can benefit from the agricultural exemption is relatively clear. Some material factual issues, however, preclude summary judgment. How long plants purchased from other vendors are tended at the nursery before resale, the extent of the work performed on such plants, and how many plants are purchased from outside nurseries are all disputed or unclear factual issues. The Defendants have thus not shown that the exemption applies. It is undisputed, however, that the statute of limitations bars any claim accruing before August 24, 2005, and so the Court will grant summary judgment to the extent that the Complaint can be read as seeking compensation and damages from before that date.

I. **FACTUAL ISSUES PRECLUDE THE COURT FROM FINDING ON SUMMARY JUDGMENT THAT THE AGRICULTURE EXEMPTION APPLIES TO THE DEFENDANTS' BUSINESS.**

Before turning to whether summary judgment is appropriate, the Court will first set out the relevant factual and legal background. Although the parties initially appear to have several rather different opinions about this case, closer inspection reveals that they are largely in agreement on the governing standards and on many of the facts. Only a few key points in the record before the Court are in dispute and material. Those differences are enough, however, to preclude the Court from properly granting summary judgment.

A. **CONCESSIONS BY THE PARTIES AT THE HEARING NARROWED THE ISSUES.**

If Conley's employees fall under the agriculture exemption, see 29 U.S.C. § 213(b)(12),

then the Defendants need not pay them overtime.[5]  Agriculture is

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f).  The agriculture exemption to the FLSA "was meant to apply broadly and to embrace the whole field of agriculture." Pacheco v. Whiting Farms, Inc., 365 F.3d at 1203 (internal quotation marks omitted).  Courts have applied the exemption to nurseries, see, e.g., Adkins v. Mid-American Growers, Inc., 167 F.3d at 356-58, and the Plaintiff does not argue that, as a general matter, nurseries are ineligible for the exemption or that all of the activities at Conley's are not agricultural.  The Plaintiff also does not try to dispute that the minor amount of wholesaling activity that the Defendants willingly admit to conducting eliminates any exemption.

Instead, the Plaintiff takes a more limited tack.  The Plaintiff primarily focuses on bringing into dispute two factual assertions: (i) whether Ted Conley's declaration severely understates the volume of plants that the Defendants purchase from other vendors for resale; and (ii) whether and to what number of plants purchased from other nurseries employees at Conley's do any significant work.  The Plaintiff contends that Conley's is in reality a wholesaler that buys plants and resales them.

Although the Plaintiff initially in her briefing appeared to argue that buying plants from other

--------

[5] In their briefing, the Defendants cite 29 U.S.C. § 213(a)(6) as exempting them from the FLSA's overtime provisions.  See Motion at 1.  That exemption, however, is an exemption from both the minimum wage and overtime provisions of the FLSA, see 29 U.S.C. § 213(a), and applies to a much narrower class of employees than the parallel exemption under § 213(b), which exempts employees only from the overtime provision.  Section 213(a)(6) requires that employees both be agricultural employees and also fall into one or more other, limited categories, which are unlikely to apply here.  By contrast, § 213(b)(12) applies broadly to agricultural employees.  The Defendants presumably are invoking § 213(b)(12).

sources made the Defendants wholesalers, see Response at 7, at the hearing, the Plaintiff agreed that the issue was more nuanced, see Tr. at 12:12-14:15 (Court & Jackson)(arguing that main issue was whether work beyond maintenance for resale was done on plants purchased from other nurseries and that the Defendants had not met their burden); id. at 19:10-18 (Jackson)(same).  Similar to the nursery in Adkins v. Mid-American Growers, Inc. that put tropical plants it purchased through an acclimatization process to prepare them for survival in the rather colder climate of Illinois, see 167 F.3d at 357, if the Defendants invested a not insignificant amount of activity in watering, fertilizing, and weeding the plants purchased from other nurseries to grow them to a larger size, see Conley Decl. ¶ 7, at 2, then that activity would be agricultural.  Such activity would fall within the class of "cultivating, watering, spraying, fertilizing, pruning, bracing, and feeding" that qualifies for the exemption.  29 C.F.R. § 780.205(a)(3).

The Defendants also made concessions at the hearing.  They acknowledged that some cultivation was necessary and that, if they bought a plant and sold it a day or two later, such transaction would be outside the exemption.  See Tr. at 20:23-21:2 (Court & Sanders).  These sales would be very similar to sales of non-acclimatized plants and "cover purchases not warranted by production shortfalls" that are not exempt activity.  Adkins v. Mid-American Growers, Inc., 167 F.3d at 357.

With all this in mind, the real issues in dispute in this case can be isolated.  The Defendants freely admit that a small portion of their business, less than a percent in their estimate, involves ordering plants from other nurseries at customers' requests.  See Conley Decl. ¶ 6, at 2.  So long as this activity is minor and cannot be separated from the rest of the activity, this brokering is exempt. See Adkins v. Mid-American Growers, Inc., 167 F.3d at 358.  The Plaintiff contends, however, that a substantial volume of the Defendants' business involves buying plants from other nurseries and

reselling them without doing any significant work on the plants.  If the Plaintiff is right then the exemption would not apply.  Whether the Plaintiff has introduced evidence that would create a factual dispute on this point is thus the crux of this motion.

### B.    FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT.

As a threshold issue, the Court must determine whether to consider the main piece of evidence that the Plaintiff puts forth: Deal's declaration.  In addition to challenging whether the declaration creates a material dispute, the Defendants contend that the declaration is too conclusory to be considered.  While brief, the declaration is not unduly conclusory.  It plainly lays out the foundation of Deal's knowledge -- his former employment with Conley's as a laborer and later a landscaping foreman, see Deal Decl. ¶ 3, at 1 -- and then describes his observations and estimates. Mathematical precision is not needed to defeat summary judgment here.  Deal estimates that "90-95% of the flowers and over 98% of the trees and shrubs used for landscaping purposes were purchased from outside vendors." Id. ¶ 5, at 1.  Even if Deal's estimate is wildly inaccurate -- if, say, fifty percent were a more appropriate figure -- such a sum might still be sufficient to preclude the application of the exemption.  Only by assuming that Deal is completely wrong or lying about his observations can the Court disregard his declaration.  Trial might reveal a different story and allow for a very in-depth examination of Deal's knowledge and calculations, but that is not the Court's role here.  The succinct summation of the basis of Deal's knowledge and the observations he asserts he made while working at Conley's are sufficiently detailed for the Court to consider them as part of summary judgment.

Accepting the declaration does not end the inquiry.  The Defendants' primary thrust is that a careful reading of Deal's declaration and Ted Conley's declaration reveals that the two are not inconsistent. This argument has some merit.  Close examination of the evidence in the record would

-17-

allow for a plausible construction of the evidence that supports the exemption applying without having to discount or ignore any of the Plaintiff's evidence. On the other hand, one can also draw inferences from the record in such a way as to show that the Defendants are engaging in the wholesale buying and selling of plants. When the issue comes down to a battle of inferences, the proper result is an easy one on summary judgment. A jury may find otherwise, but the Court's job is clear. All reasonable inferences must be made in the non-moving party's favor. See Tademy v. Union Pacific Corp., 520 F.3d at 1158. Summary judgment for the Defendants would be inappropriate here.

The Defendants make several arguments why Deal's declaration and the deposition testimony to which the Plaintiff points do not create any material disputes. First, the Defendants assert that Deal's knowledge and his conclusions address only the landscaping aspect of their business. Many of the plants, however, seem to come from the nursery side of the business. There is no indication that supply source for the landscaping is different. Rather, in Ted Conley's words, in the landscaping "portion of the business, customers come to the nursery to discuss their landscaping needs, [and] to pick out plants which are grown on premises . . ." Conley Decl. ¶ 5, at 2. And while Deal did not work in the nursery portion, it would not be unreasonable to conclude that Deal's observations are based on his experience, not speculation, given the source of the plants for landscaping and in light of the "employees working in the landscaping portion of the business" not being "separately organized" for "independent productive activity." Id. ¶ 10, at 2.

Second, the Defendants contend that Deal's declaration does not rebut Ted Conley's statement that all but a small fraction of the plants at Conley's are grown to a larger size after purchase. Paragraph 6 of Ted Conley's declaration states that Conley's will order plants from other nurseries upon request and that these orders "constitute less than one percent of sales." Conley Decl.

¶ 6, at 2.  The next paragraph reads: "<u>Additionally</u>, Conley's will order plants from other nurseries that will be grown to a larger size, fertilized, watered, planted, tended, and planted or transplanted at the nursery prior to sale."  <u>Id.</u> ¶ 7, at 2 (emphasis added).  Paragraph 7, read in conjunction with paragraph 6, thus states that Conley's buys plants from outside nurseries beyond those that customers directly request and that these plants are grown to a larger size.  This interpretation is further supported by paragraph 9, which states a general proposition: "Almost all of the plants sold by Conley's Nursery are cultivated by the employees at Conley's."  <u>Id.</u> ¶ 9, at 2.

In the Defendants' view, this reading of Ted Conley's declaration is consistent with Deal's declaration.  According to the Defendants, Deal's declaration says that the Defendants procure most of their plants from outside nurseries, but is silent about how those plants are cared for after the acquisition.  This reading is not implausible, but it is not the only one.  Two paragraphs from Deal's declaration are relevant to this question:

> 5.  I would estimate that 90-95% of the flowers and over 98% of the trees and shrubs used for landscaping purposes were purchased from outside vendors.  Once the stock received from outside vendors arrived at the nursery it was usually immediately available for customers to purchase or used for landscaping jobs already contracted by Conley's Nursery and Landscaping.
>
> 6.  The nursery grew plants like tomatoes, chili peppers, and perennial flowers.  The trees, shrubs and annuals at the nursery, and those used for landscaping purposes were purchased from outside vendors.

Deal Decl. ¶¶ 5-6, at 1.

As the Defendants stress, the first sentence in paragraph 5 refers to the plants used for landscaping being mostly from outside vendors, but says nothing about whether Conley's grew them after purchase.  The second sentence, however, notes that these plants were "immediately available for customers to purchase."  Immediately available implies that the plants could be swiftly turned around, and sold or planted at a customer's home, without Conley's ever growing them or doing

other agricultural work on them.  How many of the plants that were immediately available actually went right back out the door is impossible to tell from the statement.  The statement nonetheless raises an inference that a number of them did.  Ted Conley's declaration says that plants other than those specifically ordered were all grown or tended at Conley's.  See Conley Decl. ¶¶ 6, 9, at 2. Given the large volumes of which Deal speaks, it is hard to say that Deal is referring to the small number of plants that Ted Conley readily admits are purchased specifically for customers and not further grown at Conley's.  The upshot is that the two declarations can in fact be read as inconsistent.

Further support for this reading is found in paragraph 6 of Deal's declaration.  Deal says that the nursery "grew plants like tomatoes, chili peppers, and perennial flowers."  Deal Decl. ¶ 6, at 2. He contrasts this activity with "trees, shrubs, and annuals," which "were purchased from outside vendors."  Id.  One way of reading this paragraph is to construe "grow" as meaning that the tomatoes and chili peppers were grown from seed, in contrast to trees and shrubs, which were bought already grown somewhat, but which could still have been grown further.  Another reasonable reading, however, is that "grow" refers to grow in any manner, and the trees and shrubs were bought, never further grown, and then sold.  This latter reading conflicts with Ted Conley's statements.  Crediting Deal's statement gives rise to the possibility that a number of plants at Conley's are ordered from third parties, never grown, and then immediately resold.  If this latter scenario were true, the Defendants could lose the protection of the agricultural exemption.

In addition to Deal's declaration, the Plaintiff points to Ted Conley's statements during the wage-and-hour hearing.  Aragon recounts Ted Conley as saying that "he grew perennials and he bought seeds, which he started in trays for items such as tomatoes and perennials, but that annuals were also brought in" and, apparently quoting from a transcript of that hearing, that "[t]rees and

shrubs were also brought in." Aragon Depo. at 26:10-13.  Also during the hearing, Aragon asked

Ted Conley whether he grew "anything else other than [tomatoes and perennials], such as things that

were in the greenhouse, the things that were out back.  And [Ted Conley] said all of those were

brought in." Id. at 10:24-11:2.  When Aragon followed up, Ted Conley said "things like trees and

shrubs are brought in from other states."  Id. at 11:3-4.  Again, as with Deal's and Conley's

declarations, the Defendants have a reasonable interpretation of these statements that is consistent

with their position, but it is not the only interpretation.  When he refers to bringing in annuals, trees,

and shrubs, Ted Conley could be referring to those plants being brought in and then grown further,

in contrast to tomatoes and perennials that were grown from seed.  Another reasonable reading,

however, is that, as the Plaintiff contends, the stock being brought in was often then not grown any

further but soon sold.  These conflicting inferences must be resolved, for now, in the Plaintiff's favor

as the non-moving party.  Accordingly, Ted Conley's statements at the wage-and-hour hearing

further support there being a genuine dispute of material fact.

The Plaintiff also cites Ted Conley's deposition, during which he apparently said that, when

he got a plant from another nursery, "the first time I put water on that plant I'm growing it."

Response at 7.  This statement might tend to support the Plaintiff's position.  Like the rest of the

record, however, there are also readings of this statement consistent with the Defendants' stance:

that Ted Conley considers the growing process to start when watering begins, which does not equate

to him considering watering a plant once to be sufficient for growing.  Despite quoting the

statement, however, the Plaintiff has not attached the deposition transcript.  Because the remainder

of the evidence is sufficient to defeat summary judgment, however, the Court need not decide

whether to consider this statement despite the lack of a transcript.

The Defendants' version of events is plausible and all the evidence in the record could be

construed in a way that would support their perspective without any need to ignore or discredit evidence. Their story, however, is not the only reasonable one on the record before the Court. The Plaintiff's evidence could more directly rebut the Defendants' theory, but reasonable inferences can be drawn from the record in a way that creates material issues of fact. On summary judgment, that is all the Plaintiff must do. Accordingly, the Court cannot properly hold as a matter of law that the Defendants are entitled to invoke the agricultural exemption and therefore cannot appropriately dismiss the Complaint.

## II. THE STATUTE OF LIMITATIONS HAS RUN ON ALL CLAIMS BEFORE AUGUST 24, 2005.

The Plaintiff does not contend that the Defendants acted willfully, and there is no dispute that the two-year statute of limitations, barring claims for non-willful violations, has run on all claims before August 24, 2005, two years before the Complaint was filed. In her Response, the Plaintiff acknowledges that it cannot seek to secure back wages from before August 24, 2005, and says that it does not intend to seek back wages from before that date. See Response at 8. March 14, 2004, is the date the Complaint states as being the starting date for the Defendants' alleged violations. See Complaint ¶ VI, at 3. Because the Complaint covers a time-frame beyond the limitations period the Court will grant summary judgment as to any allegations before August 24, 2005.

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted in part and denied in part. The Court grants the motion with respect to any claims accruing before August 24, 2005. The Court otherwise denies the motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
  United States Attorney
Elizabeth M. Martinez
  Assistant United States Attorney
Albuquerque, New Mexico

-- and --

Carlton Jackson
United States Department of Labor
Dallas, Texas

      *Attorneys for the Plaintiff*

Steven K. Sanders
Law Offices of Steven K. Sanders
  & Associates, LLC
Albuquerque, New Mexico

      *Attorneys for the Defendants*